**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MAY JOSEPH, FADI ESSA, HOTEL
FURNITURE LIQUIDATORS INC, and      Case No. 19-12993
PARKING LOT SERVICE INC,

Honorable Nancy G. Edmunds

     Plaintiffs,

v.

NEVAR JAHWARY, YOUSIF DAMMAN,
and TANYA KLATT

     Defendants.

_____/

**ORDER AND OPINION DENYING**
**DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' FIRST AMENDED COMPLAINT [11]**

     Pending before the Court is Defendants Nevar Jahwary, Yousif Damman, and Tanya Klatt's Motion to Dismiss Plaintiffs' First Amended Complaint. (ECF No. 11.) Defendants seek dismissal of Plaintiffs' civil RICO claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants also seek dismissal of Plaintiffs' remaining claims pursuant to Rule 12(b)(1). Plaintiffs oppose the motion and alternatively seek leave to amend their complaint for a second time. On February 11, 2019, the Court held a hearing in connection with the motion. For the reasons set forth below, the Court **DENIES** Defendants' motion to dismiss.

## I.    Background

     Plaintiff Fadi Essa and Defendant Nevar Jahwary are cousins and former business partners. According to Plaintiffs, Essa served as a mentor and provided

financial assistance and financial opportunities to Jahwary for several years. This dispute appears to be part of the fallout of their relationship.

In the Complaint, Plaintiffs assert through allegations of wire fraud, and in violation of the Racketeer Influenced and Corruptions Act (RICO), 18 U.S.C. § 1964(c), that Defendants perpetrated a scheme to swindle Plaintiffs out of hundreds of thousands of dollars. Plaintiffs provide the following description of events leading to this lawsuit.[1]

In October 2017, Plaintiff Essa asked Defendant Jahwary to partner with him in purchasing a hotel in Ferndale, Michigan. Both men were supposed to contribute $150,000 dollars to the venture, work to refurbish the hotel, and ultimately run the hotel for profit. Plaintiffs claim that Essa made his contribution as required by the agreement, but that Jahwary collected the funds to make his own contribution through a fraud scheme referred to by Plaintiffs' as the West Coast Wholesale fraud scheme.

## A. The West Coast Wholesale Fraud Scheme

Plaintiffs allege that on or about August 17, 2017, Essa received a phone call from a man who represented himself as "Hector" from a company called West Coast Wholesale Distribution Inc. The company purported to be based in New Mexico and the phone number used by Hector appeared to be from a New Mexico area code. According to Plaintiffs, Hector is a fictional character played by

---

[1] For the purposes of Defendants' motion, the Court considers the factual allegations as set forth in the Complaint as true.

Defendant Yousif Damman and acting at the direction of Defendant Jahwary.[2] During this phone call, Hector told Essa he was in possession of over 11,200 mini-fridges suitable for hotel use and for sale at a below market price.

Essa initially declined Hector's offer. Hector, however, repeatedly called Essa to convince him to make the purchase. On September 17, 2017, Hector sent an e-mail to Essa providing detailed quotes and specifications for the mini-fridges. The e-mail included pictures of a warehouse packed with mini-fridges ready for shipment.

Eventually, Essa agreed to purchase 7,206 mini-fridges for $252,210.00 from Hector. Under the terms of the deal, Essa was required to provide a $150,000 cash payment to West Coast Wholesale, who would then release and ship the first 4,000 mini-fridges. Plaintiffs claim Hector was supposed to ship the mini-fridges within 1-2 weeks of receiving the down payment. Then, the balance of the payment would be made after Essa was able to sell the first batch of mini-fridges through his company Plaintiff Hotel Furniture Liquidators, Inc.

After Essa agreed to the proposed deal, he worked with an acquaintance, nonparty Yousef Hamo, to arrange financing. Through Hamo, Plaintiff May Joseph ultimately agreed to provide the initial $150,000 down payment. On September 18, 2017, May Joseph wired $150,000 to a holding company to be used to complete the transaction.

---

[2] Plaintiffs' references to Hector throughout the Complaint are really references to Jahwary and his alleged confederates acting as the fictional character of Hector.

Two days later, on September 20, 2017, Defendant Tanya Klatt formed an entity named "West Coast Wholesale and Distribution LLC" as a New Mexico LLC. Defendant Tanya Klatt was an employee of the Ferndale hotel purchased by Plaintiff Essa and Defendant Jahwary. According to Plaintiffs, Klatt was acting at the direction of Jahwary in forming the West Coast Wholesale and Distribution LLC entity. There are also allegations that Jahwary and Klatt may have been involved romantically.

On September 22, 2017, Hector sent Essa a sales agreement for the 7,206 mini-fridges and Essa executed the agreement on behalf of Hotel Furniture Liquidators, Inc. On September 25, 2017, Klatt opened a bank account for West Coast Wholesale and Distribution LLC. On September 26, 2017, West Coast Wholesale and Distribution LLC received the $150,000 down payment in its new bank account. Plaintiffs claim that Klatt and Jahwary immediately began drawing down on the funds for their own personal use, and that by November 3, 2017 the bank account had a balance of $5.00.

Plaintiffs allege they waited two weeks, but no fridges arrived. Plaintiffs claim Essa unsuccessfully attempted to call Hector multiple times during this period. After three months with no contact, in January 2018, Hector called Essa, apologized, and stated he needed another $50,000 for shipping. Hector allegedly claimed Essa would lose the $150,000 deposit if shipping was not paid for because the parties' contract purportedly required full payment of the purchase price within ninety days. To prevent losing his deposit, on February 8, 2019, Essa claims he

wired the requested $50,000 through one of his other companies, Plaintiff Parking

Lot Service, Inc.

On February 10, 2018, Hector sent Essa a text message stating:

> "Fadi sorry Im in Denver Ill see if I can have the supplier ship it next week. Because you took more than 3 months and we had an agreement to have this completed in less than 90 days."

Then on February 13, 2018, Hector texted:

> "Fadi sorry Im in Denver I talked to the company and they said they will ship it between 2-3 weeks."

On March 2, 2018, Essa texted Hector the following:

> "Please call me as soon as possible, I don't wanna go through courts and file a lawsuit so please call me as soon as possible."

Hector replied:

> "Fadi if you wanna sue me go ahead you messed up in the contract you had 90 days to pay or you lose your deposit and you sent the money after 5 months some of the fridges are sold already. If you want I will send you the 50k for the shipping and you can fly out here and arrange your own shipping, let me work on the deal, I'm out of the country give me some time.

Plaintiffs claim this is the last communication they had with Hector.  Plaintiffs allege

that to this date, they have not received any mini-fridges, nor have they received

any further communications about the mini-fridges.  On April 6, 2018, Essa

received a wire transfer of $39,500 from West Coast Wholesale and Distribution

LLC.  This money apparently represents a refund of part of the $50,000 paid

towards shipping.  Essa and his investors claim they considered the money to be

lost until they uncovered the alleged fraud scheme through a separate lawsuit.

**B. Ferndale Lodging LLC and Plaintiffs discovery of the alleged fraud**

In 2019, a non-party sued Defendant Jahwary for allegedly breaking his agreement with respect to the membership interests in the Ferndale, Michigan hotel. Plaintiff Essa is also involved in that lawsuit. The hotel was owned through a limited liability company named Ferndale Lodging LLC, which was formed by Plaintiff Essa and Defendant Jahwary. Essa claims he offered Jahwary the opportunity to partner with him in the Ferndale Lodging venture.

The purpose of the venture was to purchase the hotel, remodel it, and ultimately operate it. To start the business, Essa made an initial capital contribution to Ferndale Lodging and Jahwary agreed to make an equal capital contribution. In addition, Jahwary offered to manage the day to day operations while Essa handled the major renovation work. Jahwary was named the managing member of the company and was responsible for overseeing the hotel's finances.

The Ferndale Lodging lawsuit opened discovery into the company's bank records. According to Plaintiffs, the bank records obtained in discovery reflected an October 16, 2017 wire transfer of $60,000 from West Coast Wholesale and Distribution LLC to Ferndale Lodging LLC. The wire transfer was booked as a "contribution" to Jahwary's membership interest and also as a "Loan Payable – Nevar Jahwary." The bank records also purportedly reflect a February 28, 2018 wire transfer of $48,000 from West Coast Wholesale and Distribution LLC to the Ferndale Lodging LLC. This wire was similarly booked as "Loan Payable – Nevar Jahwary." Plaintiffs claim these records provide evidence that Jahwary financed

his membership interest in Ferndale Lodging with Plaintiffs' money—money obtained by fraud through the West Coast Wholesale scam.

Plaintiffs reported the alleged fraud scheme to the Warren Police Department. An investigation was conducted. Plaintiffs claim Defendant Klatt was interrogated by police officers and that she admitted to forming West Coast Wholesale and Distribution LLC at the direction of Defendant Jahwary. But Klatt also stated that Jahwary told her Plaintiff Essa was a partner in the scam. Ultimately, the Macomb County Prosecutor's office decided not to pursue a criminal case against any of the parties.

In reviewing the police investigation files, Plaintiff Essa claims he discovered an affidavit from Defendant Yousif Damman in which Damman states that Essa is his cousin and that Essa directed him to act as Hector in perpetrating the West Coast Wholesale fraud scheme. According to Plaintiffs, Defendant Damman is not Essa's cousin and Essa did not direct Damman to pose as Hector. Plaintiffs allege that Damman is the son of one of Essa's friends. After learning about the affidavit, Essa confronted Damman about his statements. According to Plaintiffs, Damman admitted he posed as Hector at the direction of Defendant Jahwary and signed the false affidavit at the direction of Jahwary's lawyers.

In addition to committing the West Coast Wholesale scam, Plaintiffs allege that Defendants utilized their position with Ferndale Lodging LLC to embezzle and siphon off funds, including the funds obtained through the West Coast Wholesale fraud and funds from other investors in the venture. Plaintiffs further allege that

Defendants committed additional acts of embezzlement and wire fraud in connection with their management of Ferndale Lodging, LLC.

### C. Allegations of additional fraudulent conduct

Plaintiffs claim Defendants have a history of conducting fraudulent schemes similar to the West Coast Wholesale scheme. Plaintiffs allege that beginning in 2013, Defendant Jahwary with assistance from others perpetrated a similar scheme through a company named Hotel Liquidators, LLC. The Hotel Liquidators scheme involved offering used hotel grade furniture for sale through the website www.hotelliquidator.net, and more specifically, the offering for sale of Amana-brand PTAC units (Packaged Terminal Air Conditioners) for the below-market price of approximately $600 per unit. According to Plaintiffs, Defendants did not actually possess the PTAC units that they were purporting to sell. Plaintiffs claim victims of the scheme placed online orders for PTAC units through the www.hotelliquidator.net website, made deposits for their purchases using credit cards, and were collectively defrauded of approximately $360,000 when Jahwary failed to deliver the purchased goods. Plaintiffs further allege that Defendants, or at least Jahwary, transferred by wire transfer the fraudulently obtained deposits to a different account overseen by Jahwary. As a result, according to Plaintiffs, neither the customers nor their credit card companies were able to complete a chargeback and recover the funds. It is unclear from the Complaint when this scheme terminated or whether it remains active. It is also unclear whether any litigation or a criminal investigation arose from this scheme. However, Plaintiffs

allege that the entity "Hotel Liquidators" Inc. is still in existence and the website continues to be operated by Jahwary.

Plaintiffs also claim Defendants made prior attempts to perpetrate the West Coast Wholesale scheme. Plaintiffs point to an e-mail produced by Defendants dated August 2015 in which Hector is offering to sell the same mini-fridges to Essa on similar terms.[3] Plaintiffs contend this earlier e-mail is evidence of a long running criminal fraud scheme and enterprise.

Plaintiffs further claim that Defendants are or were continuing to attempt to scam other potential purchasers through their West Coast Wholesale scheme. On March 19, 2018, Luke Joseph (Plaintiff May Joseph's husband) texted Hector at the (505) 337-0929 phone number as an anonymous interested buyer of hotel furniture. Plaintiffs claim the purpose of this communication was to test the criminality of the organization involving Hector. Hector responded to Luke Joseph's inquiry:

> "I have Refurbished Ptacs they are n50 per unit and they come with 90 days warranty and ready to ship any time. Let me know how many you need, I would be able to get better price depending on quantity."

Plaintiffs contend this text message is evidence that Defendants were continuing or at least willing to continue to their scheme on other potential purchasers. The

---

[3] Plaintiffs state that the e-mail is likely fake, meaning it was not actually sent in 2015 and was created (presumably by Defendants) for the purpose of using in litigation. The e-mail exhibit submitted by the parties is a screenshot of an e-mail from a phone. There are no bates labels and there is no explanation of the source or authenticity of the exhibit. Defendants point to the e-mail as evidence that Plaintiff Essa was involved in the fraud scheme.

communications between Joseph and Hector eventually stopped with Hector breaking off communications.

In addition to running hotel furniture fraud schemes, Plaintiffs allege that Defendants engaged in various insurance fraud schemes, some of which related to their hotel businesses. Plaintiffs generally allege that Defendant Jahwary has "coordinated the actions of others" to commit insurance fraud by (1) collecting insurance proceeds in 2012 for a Penske moving truck that "enterprise associates" intentionally damaged, (2) collecting disproportionate insurance funds for a used Lamborghini that "enterprise associates" intentionally totaled in Las Vegas, and (3) collecting at least $130,000 of Y & F LLC partnership funds intended for the restoration of a Houghton Lake hotel, which allegedly directly caused injury to Plaintiff Hotel Furniture Liquidators, Inc.[4]

## D. Procedural background

Although many of the parties are involved in separate litigation in other venues[5], on October 10, 2019, Plaintiffs initiated this action seeking damages solely in connection with the West Coast Wholesale fraud scheme. Plaintiffs assert a claim under the civil RICO statute along with various state law fraud-based claims. Specifically, Count 1 asserts violations of 18 U.S.C. § 1362 (c) and (d) based on the alleged incidents of wire fraud involved in the West Coast Wholesale scheme. Plaintiffs' remaining claims are state law claims. Counts 2-4 assert state

---

[4] Plaintiffs claim this conduct is the subject of state court litigation.
[5] The status and location of the other matters is not clear from the record in this case.

law fraud claims based on the West Coast Wholesale scheme. Count V asserts a claim for civil conspiracy. Count VI asserts a claim for statutory and common law conversion of Plaintiffs' monies. Count VII asserts a violation of the Michigan Consumer Protection Act. And Counts VIII and IX assert claims for unjust enrichment and quantum meruit.

On December 05, 2019, Defendants moved to dismiss Plaintiffs' original complaint. Defendants argued the complaint failed to establish the existence of a pattern of racketeering activity and therefore Plaintiffs' RICO claim failed as a matter of law. Defendants further contended that because the parties are non-diverse, the Court lacked subject matter jurisdiction over Plaintiffs' remaining state law claims.

On December 26, 2019, Plaintiffs responded to the motion by filing an Amended Complaint.[6] In the Amended Complaint, Plaintiffs provide new details about Jahwary and the other Defendants' alleged fraudulent activities. These additional allegations were added to the comprehensive and detailed background section of the Complaint. Plaintiffs, however, did not substantively modify the allegations in Count I to include new or additional actionable conduct.

In response to the filing of the Amended Complaint, Defendants again moved to dismiss. In their renewed motion, which is now pending before the Court, Defendants contend the additional allegations are still insufficient to establish the

---

[6] Defendants' initial motion to dismiss (ECF No. 8) is therefore **DENIED as moot**.

pattern of racketeering required to state a RICO claim.  Defendants also argue that there is no evidence to support the new allegations of fraudulent conduct, that the new allegations are not pled with particularity as required by Federal Rule of Civil Procedure 9(b), and that the new allegations are barred by the statute of limitations.  And Defendants submit their own evidence which they contend rebuts many of Plaintiffs' allegations of fraud.[7]  Plaintiffs oppose the motion and argue they sufficiently establish a pattern of racketeering activity to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs alternatively request leave to file a second amended complaint.[8]

## II.    Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted.  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn. Dep't*

---

[7] The Court declines to consider the additional evidence not attached to or referenced in Plaintiffs' complaint in considering Defendants' Rule 12 motion.
[8] Plaintiffs do not indicate what additional allegations would be included if granted to leave to amend their complaint for a second time.

*of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). Dismissal is appropriate if the plaintiff fails to offer sufficient factual allegations that make the asserted claim plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009):

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.,* at 557 (brackets omitted).

*Id.* at 678. A plaintiff's factual allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Thus, "[t]o state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Bredesen*, 500 F.3d at 527.

In addition, if a court considers matters outside of the pleadings, the court must convert the motion into one for summary judgment under Rule 56. *Turner v. Corr. Med. Servs., Inc.*, No. 13-11783, 2014 WL 861579, at *2 (E.D. Mich. Mar. 5, 2014). However, "[w]hen a court is presented with a 12(b)(6) motion, it may

consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But "a court may only take judicial notice of a public record whose existence or contents prove facts whose accuracy cannot reasonably be questioned." *Passa v. City of Columbus*, 123 Fed. Appx. 694, 697 (6th Cir. 2005).

## III. Analysis

The civil RICO statute, 18 U.S.C. § 1964(c), creates a cause of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § ] 1962." *See Aces High Coal Sales, Inc. v. Cmty. Bank & Tr. of W. Georgia*, 768 F. App'x 446, 453 (6th Cir. 2019). The phrase "by reason of" means the injury must be proximately caused by the RICO violation. *See Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265-68 (1992).

Plaintiffs here assert violations of § 1962(c) (conducting an enterprise through a pattern of racketeering activity); and § 1962(d) (conspiring to violate the other provisions of § 1962). To establish a violation of § 1962(c), a plaintiff must plead "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). Defendants do not appear to challenge whether the alleged instances wire fraud fall within the statute or whether Plaintiffs adequately establish the existence of an enterprise. Here, the disputed issue is whether a "pattern of racketeering" is sufficiently pled.

A pattern is defined as a minimum of two predicate acts of racketeering activity within ten years of each other, although two acts may not be sufficient. *See* 18 U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237 (1989). To establish a pattern, a plaintiff "must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. This is known as the "relationship plus continuity" test. *Aces High Coal Sales, Inc.*, 768 F. App'x at 453-54. The relationship and continuity components are analyzed separately, although "their proof will often overlap." *Id.*

"The relationship prong is satisfied by showing the predicate acts have similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 240). "A particular defendant's predicate acts are not required to be interrelated with each other; instead, the predicate acts must be connected to the affairs and operations of the criminal enterprise." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 795 (6th Cir. 2012).

The second prong of the pattern test is continuity. *Aces High Coal Sales, Inc.*, 768 F. App'x at 455. "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (quoting *H.J. Inc.*, 492 U.S. at 241). Whether the predicate acts satisfy the continuity requirement depends on the particular facts of the case. *Id.*

When the criminal activity is interrupted by the filing of a RICO lawsuit, open-ended continuity may be established where "the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit[ly] or explicit[ly]." *Id.* at 456 (quoting *H.J. Inc.,* 492 U.S. at 242). A threat of continuity may also be established "by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* "The threat of continuing racketeering activity need not be established ... exclusively by reference to the predicate acts alone; rather, a court should consider the totality of the circumstances surrounding the commission of those acts." *Id.* (quoting *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 410 (6th Cir. 2012)). Nor does the fortuitous interruption of that activity affect whether there was a threat of continuing criminal activity at the time the activity occurred. *Id.* (citing *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991)).

For example, in *Kalitta Air, LLC v. GSBD & Associates*, 591 F. App'x 338 (6th Cir. 2014), the Sixth Circuit reversed the district court's dismissal of RICO claims finding that the plaintiff had alleged "sufficient facts to raise a plausible inference of open-ended continuity." *Kalitta Air, LLC*, 591 F. App'x at 345. The plaintiff in *Kalitta* alleged fraud in connection with a contract for the purchase of jet fuel to be paid from an escrow account only after delivery. The defendant repeatedly transferred money from the escrow account in violation of the escrow terms and shorted the deliveries of fuel until plaintiff discovered the conduct and terminated the contract. The Sixth Circuit concluded that the acts and offenses

were part of the defendants' "regular way of doing business." *Id.*  The Sixth Circuit found that at the time the predicate acts occurred, the scheme could have continued indefinitely under the parties' contract which renewed every year unless terminated. *Id.*  The scheme, therefore, did not have a "built-in endpoint" and was not "inherently terminable." *Id.* at 346.

Similarly, the Sixth Circuit found the adoption fraud scheme in *Heinrich* sufficiently alleged a threat of continuity because "there [was] no inherent limit to the number of couples seeking to adopt or to the number of children that the defendants could hold out as available for adoption." 668 F.3d at 411.  And in *Busacca*, the Sixth Circuit upheld the RICO conviction of a defendant who embezzled pension funds from his union six times before the scheme was interrupted. 936 F.2d at 238.  There, the circumstances established open-ended continuity because the "manner in which the embezzlements occurred was capable of repetition indefinitely into the future." *Id.*  In each of these cases, the Sixth Circuit found open-ended continuity because the complaint did not allege an inherently terminable scheme—a pattern of racketeering activity with a built-in ending point.

Alternatively, a plaintiff "alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. *Aces High Coal Sales, Inc.*, 768 F. App'x at 457. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.* (quoting *H.J. Inc.*, 492 U.S. at

242).  The Sixth Circuit in *Vemco* held that predicate acts allegedly committed over a 17-month period failed to establish a closed-ended period of racketeering activity. *See Vemco, Inc. v. Camardella*, 23 F.3d 129, 134-35 (6th Cir. 1994).  But as the Sixth Circuit recently acknowledged, a bright-line 17-month rule has not been adopted and *Vemco* should not be interpreted as establishing such a rule. *See Aces High Coal Sales, Inc.*, 768 F. App'x at 457 (discussing *Vemco*).

In *Vemco*, after the unrelated predicate acts were disregarded, the Sixth Circuit found that the remaining acts were insufficient to establish continuity because: (1) there was a single fraudulent scheme to misrepresent a guaranteed price and then extort a higher price; (2) the total scheme lasted only seventeen months; and (3) the goal of the single criminal episode was "to get Vemco to pay the cost of one paint system." 23 F.3d at 134. *See also Heinrich*, 668 F.3d at 410 (interpreting *Vemco* as "finding that allegations of four predicate acts, affecting one victim and spanning seventeen months, were insufficient to meet the continuity requirement").

In *H.J. Inc.*, the Supreme Court emphasized that continuity is "centrally a temporal concept" and one that depends on the facts of a given case. 492 U.S. at 242.  The Court also rejected a rigid test that would require multiple criminal schemes, while acknowledging that the involvement of multiple criminal schemes would be relevant. *Id.* at 241.  Consistent with *H.J. Inc.,* the Sixth Circuit applies a multi-factored approach that considers "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the

presence of separate schemes and the occurrence of distinct injuries." *Aces High Coal Sales, Inc.*, 768 F. App'x at 457 (quoting *Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1110 (6th Cir. 1995)). For example, in *Moon v. Harrison Piping Supply*, 465 F.3d 719, 724 (6th Cir. 2006), the Sixth Circuit held that the defendants' coordinated scheme to wrongfully terminate the plaintiff's workers' compensation benefits did not establish a closed-ended period of continuity even if the predicate acts had spanned two and one-half years. *See Moon*, 465 F.3d at 725-26. The Court found that the predicate acts were all "keyed" to a "single objective" with no other schemes, purposes, or injuries alleged, or any facts suggesting the scheme would continue once the goal was achieved*. Id.*

Here, the allegations concerning the Westcoast Wholesale fraud scheme and the subsequent Ferndale Lodging embezzlement are really part of a single fraud scheme. As alleged in the Complaint, Defendant Jahwary orchestrated a scheme with assistance from Defendants Klatt and Damman to fraudulently extract monies from Plaintiffs. This scheme alone would not be enough to establish a RICO claim. All of the predicate acts of wire fraud were keyed to a single objective. Alone, this activity constitutes an inherently terminable scheme–a pattern of racketeering activity with a built-in ending point—which the Sixth Circuit has found cannot sustain a RICO claim.

But Plaintiffs allege additional predicate conduct which they contend to be sufficient to establish a pattern of racketeering activity. Plaintiffs claim Defendant Jahwary was involved in three separate insurance fraud schemes, including one

where Plaintiff Hotel Furniture Liquidators Inc. was a victim. The relationship between these schemes and the West Coast Whole scheme is that they all involve fraudulent conduct, one of the insurance fraud schemes involves a common victim, and one of the insurance fraud schemes involves a hotel. This is not enough to satisfy the relationship test. Accordingly, the Court will not consider the purported insurance fraud schemes as predicate acts to establish a pattern of racketeering.

Plaintiffs also present allegations that Defendants ran a related scheme through an entity called Hotel Liquidators, LLC. Under this scheme, Jahwary and his associates allegedly duped consumers into paying for furniture while never delivering the goods. The Court finds that this scheme is sufficiently related to the West Coast Wholesale fraud to support a pattern of racketeering. The two schemes share the same general purpose, category of victims, and results. The methods of the commission were slightly different: in the West Coast Wholesale scheme, Defendants reached out directly to Plaintiffs via e-mail, while the Hotel Liquidators scheme was allegedly run through a website. But conceptually the two schemes are similar—Defendants allegedly offered for sale hotel furniture at liquidation prices with the intent to never complete the sale.

The Court further finds that this conduct together with the West Coast Wholesale scheme satisfies the continuity requirements. There is no inherent limit to the number of potential customers who could fall victim to these schemes. And the allegation that Defendants still control the entity and website involved in the Hotel Liquidators scheme raises a potential inference that Defendants are or may

still be running the scheme.  The Court agrees with Defendants that the existence of a website and the ownership of an entity in and of itself does not establish the continuity of an illegal enterprise.  But when the purpose of the entity and the website is to commit fraud, then the continued existence of the entity and website may provide some support for finding continuity.

Finally, Plaintiffs present some, albeit tenuous, factual allegations indicating Defendants began their West Coast Wholesale fraud in 2015 and continued or attempted to continue the scheme beyond the single encounter with Plaintiffs here. The 2018 text messages with Luke Joseph reflect a willingness and desire by Defendants to run the same fraud on an unrelated customer.  And the e-mail from Hector to Plaintiff Essa in 2015, at least as it is described in the Complaint, provides some indication of the Defendants' alleged earlier efforts to perpetrate the scheme. These additional allegations are sufficient to raise factual questions about the continuity element of the general scheme involved in the West Coast Wholesale scam to survive a motion to dismiss.

Construing the Complaint in a light most favorable to Plaintiffs, the Court finds Plaintiffs sufficiently state a plausible RICO claim to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  The Court's ruling, however, should in no way be construed as support for the ultimate viability of Plaintiffs' RICO claim. Indeed, there appears to be significant work to be done. Plaintiffs must ultimately produce actual evidence establishing the existence of an enterprise as well as actual evidence to support the relationship and continuity

elements. Whether it would be more prudent for Plaintiffs to withdraw their RICO theory and pursue their fraud claims in state court is not a question for this Court to decide.

The Court will now turn to Defendants' remaining arguments. Defendants contend there is no factual basis for the "preposterous allegations" and "fabricated allegations" of the additional predicate acts included in the Complaint. However, at this stage of the proceedings, the Court does not consider Defendants' evidentiary-based arguments concerning Plaintiff Essa's alleged role in this scheme or as to whether Hector Martinez is in fact a real person. Those factual disputes, and others, are more properly considered at the summary judgment stage.

Defendants also contend the statute of limitations for claims related to the additional predicate acts has passed and therefore the allegations cannot support a RICO claim. Defendants do not cite to any authority for this proposition and the Court is not aware of any. Moreover, Plaintiffs concede they are only seeking damages directly related to the West Coast Wholesale scheme. This argument is overruled.

Finally, Defendants argue the predicate acts involving alleged fraudulent conduct were not sufficiently pled with particularity. When predicate acts are based on fraud, Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement applies. *Brown v. Cassens Transp. Co.*, 546 F.3d 347, 356 n. 4 (6th Cir. 2008). At a minimum, the complaint alleging a RICO claim must state "the

nature of the fraud [that] gives rise to the predicate offense." *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152 (6th Cir. 1987). The Court is satisfied that the Complaint states the allegations of fraud with sufficient particularity. Accordingly, this argument is overruled.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is **DENIED**. Plaintiffs' request for leave to amend their complaint is **DENIED as moot**.

**SO ORDERED.**

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge


Dated:  March 16, 2020

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 16, 2020, by electronic and/or ordinary mail.


s/Lisa Bartlett
Case Manager